IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>DAMION TYSON FRAGA,<br><br>Defendant. | MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS<br><br><br><br>Case No. 2:11-CR-674 TS |

This matter is before the Court on Defendant Damion Tyson Fraga's Motion to Suppress Evidence/Statements.[1] Defendant seeks to suppress statements he made following his detention and arrest, pursuant to DUCrimR 12-1(d). The Court held an evidentiary hearing in this matter on December 13, 2011. Defendant filed a memorandum in support of his Motion to Suppress on January 9, 2012. The Government filed a response on January 30, 2012, and Defendant filed a reply on February 3, 2012. The Court has considered the evidence and arguments presented and, for the reasons provided more fully below, will deny Defendant's Motion to Suppress.

---

[1]Docket No. 21.

1

I.  BACKGROUND

Defendant is charged with possessing firearms after having been convicted of a crime punishable by imprisonment exceeding one year, and possessing cocaine with the intent to distribute.  Defendant has moved the Court to suppress all statements made by Defendant to law enforcement on April, 28, 2011—including those statements in which Defendant claimed or took responsibility for drugs and firearms found in the home where Defendant was living.

In the evidentiary hearing on December 13, 2011, the Court heard testimony from three witnesses, Officer Chris Williamson, Defendant, and Defendant's girlfriend.  The following statement of facts are taken from the testimony provided in that hearing.

On April 28, 2011, Officer Chris Williamson and others of the DEA Metro Narcotics Task Force served a search warrant on the home where Defendant was living with his girlfriend and her family.  Defendant was the target of the warrant.  The warrant was based on information from confidential informants, observations of short stay traffic at the residence, and a controlled buy.  Defendant's girlfriend was not listed in the warrant.  However, the officers had information from confidential informants that she had been present during drug sales.

During the search of the home, officers found marijuana, cocaine, prescription pills, approximately $1200 in cash, and two firearms in a closet in the living room.[2]  Officer Williamson interviewed each of the residents of the home and determined that the living room was occupied by Defendant and his girlfriend.  When questioned with regard to the illegal items

---

[2]The closet in question was previously a separate entryway to the home.  The exterior entrance had been sealed off and the entryway area was converted into a closet space with shelving but no interior closet doors.  *See* Docket No. 35, at 25.

found in the closet, Defendant's girlfriend indicated that the illegal items were not hers but was unwilling to identify the owner of the items.

Officer Williamson also interviewed the Defendant. The record supports a finding that Defendant was provided his *Miranda* rights.[3] Defendant indicated that he did not have anything to say to Officer Williamson. Officer Williamson advised Defendant of the items they had found in the closet and that all of the other residents of the house had indicated that Defendant and his girlfriend used that closet. Officer Williamson also explained to Defendant that, based on what was found and what the officers had been told, both Defendant and his girlfriend could be charged. Officer Williamson then told Defendant that he (Officer Williamson) "didn't want anybody who was innocent of having these items [to] go to jail."[4]

Around fifteen to twenty-minutes after Officer Williamson's exchange with Defendant, the officers completed the search of the residence. At that point, the decision was made to arrest both Defendant and his girlfriend. The officers were aware at the time of arrest that Defendant's girlfriend was pregnant.

Officer Williamson escorted Defendant—who had been in handcuffs throughout the search—from the back of the driveway towards a police car that was parked directly in front of the house. Meanwhile, other officers placed Defendant's girlfriend under arrest. Defendant's girlfriend was in front of the house watching over their child. As the officers brought Defendant

---

[3]Defendant asserts that he cannot recall whether he was provided a *Miranda* warning. Officer Williamson testified that Defendant received the *Miranda* warnings.

[4]Docket No. 21, at 31. *See also id.* at 17-18.

up the driveway, Defendant could see his girlfriend being placed in handcuffs at the front of the house.[5]

Defendant then "asked the officer what was going on," and stated "why are you guys taking her, why is she being—you know, why are you putting handcuffs on her."[6] Defendant testified that an officer responded that since nobody was claiming the drugs and the firearms that they were going to take them both.[7] Defendant then requested that the officers not take his girlfriend stating that "she doesn't have anything to do with this . . . [t]hat stuff is not hers,"[8] and finally, "the stuff is mine."[9]

Officer Williamson testified that on hearing this, he asked, "[w]hat do you mean the stuff is yours?"[10] The Defendant eventually responded by claiming that the drugs were his.[11] Officer

---

[5]At this point the testimony of the three witnesses diverges. The Court's statement of facts is taken from the testimony it finds the most credible as to the sequence of events that occurred as Defendant and his girlfriend were transported to the police vehicles.

[6]*Id.* at 67.

[7]*See id.*

[8]*Id.*

[9]*Id.* at 20.

[10]*Id.*

[11]It is clear from the record that this was not an immediate response. Officer Williamson testified that "[e]ventually [Defendant] said that the drugs were his." *Id.* Defendant testified that while he was being escorted up the drive the officers stated on no less than two occasions that "nobody was taking responsibility for what was found so that they had to take both of us." *Id.* at 68.

4

Williamson then asked about the firearms and indicated that if nobody took responsibility for the firearms they would still both have to go to jail. Defendant eventually responded, "[O]kay, the guns, they are mine too . . . just don't take her to jail."[12] The officers then released Defendant's girlfriend from custody.

## II. DISCUSSION

Defendant asserts that his statements—which constitute a confession—should be suppressed because (1) Defendant invoked his *Miranda* right to remain silent and Officer Williamson's further statements violated that right and (2) because Defendant's statements were involuntary and coerced.

A.  MIRANDA

"In *Miranda v. Arizona*, the Supreme Court held that the Fifth Amendment privilege against self-incrimination prohibits admitting statements given by a suspect during 'custodial interrogation' without a prior warning."[13]

> *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.[14]

---

[12]*Id*. at 20.

[13]*United States v. Cook*, 599 F.3d 1208, 1213 (10th Cir. 2010) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)).

[14]*Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980).

5

"The test for functional equivalence of interrogation turns not on the subjective intent of the law enforcement officer, though it is a relevant factor, but on the objective assessment that a reasonable person in the suspect's position would perceive the officer's statements and actions as interrogation."[15]

Here, the parties do not dispute that Defendant was in custody. Further, the record supports a finding that Defendant was provided the proper *Miranda* warnings and invoked his right to remain silent. The issue then, is whether Defendant's statements were made in response to any violation of Defendant's right to remain silent.

The United State Supreme Court held in *Michigan v. Mosley*,[16] that "a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the Miranda safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests."[17] The court went on to explain "that the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his right to cut off questioning was scrupulously honored."[18] In applying this language, the Tenth Circuit has stated that "the touchstone is

---

[15] *United States v. Singleton*, 922 F. Supp. 1522, 1530 (D. Kan. 1996) (citing *United States v. Taylor*, 985 F.2d 3, 7 (1st Cir. 1993), *cert. denied*, 508 U.S. 944 (1993)).

[16] 423 U.S. 96 (1975).

[17] *Id.* at 102.

[18] *Id.* at 105.

whether a review of the circumstances leading up to the suspect's confession reveals that his right to cut off questioning was fully respected."[19]

Here, Defendant asserts that his statements were made in response to Officer Williamson's commentary—after Defendant invoked his right to remain silent—that both Defendant and his girlfriend would be arrested and an innocent person should not go to jail.[20] This assertion is not supported by the record.

The statements that Defendant seeks to have suppressed were made between fifteen and twenty-minutes after Officer Williamson interviewed Defendant. Moreover, by Defendant's own account, he did not say anything in response to Officer Williamson's statements during his interview with Defendant.[21] Rather, Defendant made the statements in question when he realized that his girlfriend was going to be arrested. As an initial matter, the Court finds, therefore, that Defendant's statements were not made in response to any questioning by Officer Williamson.

Furthermore, the Court is not persuaded that the officers' actions in taking Defendant's girlfriend into custody were the "functional equivalent" of interrogation. In *Innes*, "[t]he court defined the 'functional equivalent' of interrogation as 'any words or actions on the part of the

---

[19]*Robinson v. Att'y Gen. of State of Kan.*, 28 Fed. Appx. 849, 853 (10th Cir. 2011) (unpublished) (citing *Mosley*, 423 U.S. at 104; *see also United States v. Schwensow*, 151 F.3d 650, 659 (7th Cir. 1998)).

[20]Docket No. 32, at 6.

[21]Docket No. 21, at 72.

7

police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'"[22]

Here, the complained of actions were those normally attendant to arrest and custody. Defendant attests that when he saw his girlfriend being handcuffed, he got "argumentative" and was "concerned about her well being."[23] Such a reaction is reasonable under the circumstances. However, on objective assessment, a reasonable person in the suspect's position would not perceive the officer's actions in handcuffing and arresting Defendant's girlfriend as "interrogation."

In sum, the Court finds that Defendant's statements were not made in response to any questioning by Officer Williamson, nor did the officer's actions in taking Defendant's girlfriend into custody constitute the functional equivalent of interrogation. The Court will, therefore, deny Defendant's Motion on the grounds that the Defendant's *Miranda* rights were not violated.

B.   VOLUNTARINESS

"The Government bears the burden of showing, by a preponderance of the evidence, that a confession is voluntary."[24] The Tenth Circuit has instructed that "[t]he essence of voluntariness is whether the government obtained the statements by physical or psychological coercion such that the defendant's will was overborne."[25] Voluntariness is determined "based on the totality of

---

[22]*Easley v. Frey*, 433 F.3d 969, 973 (7th Cir. 2006) (quoting *Innis*, 446 U.S. at 301).

[23]Docket No. 21, at 67.

[24]*United States v. Williams*, 576 F.3d 1149, 1162 (10th Cir. 2009) (citing *United States v. Lopez*, 437 F.3d 1059, 1063 (10th Cir. 2006)).

[25]*United States v. Rith*, 164 F.3d 1323, 1333 (10th Cir. 1999).

the circumstances, examining: (1) the defendant's age, intelligence, and education; (2) the length of the detention and interrogation; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subjected to or threatened with any physical punishment."[26] The Court must "address first the details of the interrogation, before considering [Defendant's] personal characteristics, because his personal characteristics 'are relevant only if [the] court first concludes that the officers' conduct was coercive.'"[27]

Here, it is clear from the record that Defendant was advised of his constitutional rights. Moreover, Defendant was not subject to physical punishment, nor was Defendant subject to an extended period of detention, interrogation or questioning.[28] Defendant, however, asserts that his confession was involuntary and coerced.

In support of his assertion, Defendant cites to this Court's holding in *United States v. Fenstermaker*.[29] In that case, the court held that the government failed to carry its burden to show that consent was freely, voluntarily, and intelligently given to search a defendant's home without a warrant and to demonstrate that defendant was not coerced into providing such

---

[26] *Williams*, 576 F.3d at 1162 (citing *United States v. Lugo*, 170 F.3d 996, 1004 (10th Cir. 1999)).

[27] *Lopez*, 437 F.3d at 1064 (quoting *United States v. Erving L.*, 147 F.3d 1240, 1249 (10th Cir. 1998)).

[28] Officer Williamson testified that the entire incident from search to arrest took around an hour to an hour and five minutes. *See* Docket No. 21, at 41.

[29] 402 F. Supp. 2d 1349 (D. Utah 2005).

consent.[30] Defendant further cites to various cases that have held that threats to arrest third-parties, usually family members, may render a defendant's confession involuntary, if no probable cause exists to make such an arrest.[31]

First, Defendant's reliance on precedent that establishes that threats to arrest third-parties may render a defendant's confession involuntary is misplaced. In the instant case, it is clear that the officers had probable cause to arrest Defendant's girlfriend. The officers had information from confidential informants that placed Defendant's girlfriend at the scene of previous drug transactions at that location. Furthermore, the guns and drugs were found in a closet area that was, at the very least, principally used by Defendant and his girlfriend. This is not a case where, without cause, Defendant was threatened with the arrest of his girlfriend. Rather, based on probable cause and pursuant to its search, the officers on-scene made a decision that the Defendant and his girlfriend should be arrested.

This Court's precedent in *Fenstermaker* is similarly distinguishable from the instant case. In *Fenstermaker*, the officers engaged in a ploy designed to allow them entrance to a defendant's house without a search warrant.[32] Furthermore, once in the house, the officers engaged in a bargaining tactic to induce the defendant to consent to a search of his home in exchange for the officers not bringing charges against the defendant's girlfriend.[33]

---

[30]*Id*. at 1358.

[31]*See Lynumn v. Ill.*, 372 U.S. 528, 534 (1963); *United States v. Finch*, 998 F.2d 349, 356 (6th Cir. 1993); *Newland v. Hall*, 527 F.3d 1162, 1189 (11th Cir. 2008).

[32]*Fenstermaker*, 402 F. Supp. 2d at 1351.

[33]*See id.* at 1353-54.

Here, the officers conducted the search of the subject residence pursuant to a lawful search warrant. Furthermore, there is no evidence before the Court that the officers engaged in bargaining with the Defendant. Rather, in response to the spontaneous and admittedly argumentative questioning of the Defendant, the officers re-iterated their intention to take into custody those individuals for whom they had probable cause as to the possession of the drugs and guns.

This Court is persuaded that the facts of this case bear more similarity to *United States v. Williams*.[34] In that case, the defendant claimed he was coerced into confessing because the agents threatened to prosecute his girlfriend.[35] In considering this argument, the court held that "[e]ven if [the defendant's] confession was motivated by a desire to spare his girlfriend from an investigation and its possible consequences, such motivation does not render the confession involuntary."[36]

In sum, while the Court is cognizant of the effect viewing his pregnant girlfriend being handcuffed in front of his small child must have had on Defendant, the Court is not convinced that such a reaction converts a lawful arrest into a coercive action. Therefore, based on the totality of the circumstances, the Court finds that the officers' conduct was not coercive. For this reason, the Court finds that Defendant's statements were voluntary.

---

[34] 141 F.3d 1186, 1998 WL 166097 (10th Cir. 1998) (unpublished).

[35] *Id*. at *3, 7. ("The FBI agents testified they told Williams that his girlfriend, who had rented the car he drove and who owned the gun he carried, would be the subject of further investigation as a potential witness or accomplice. . . . Williams contends that these statements about his girlfriend coerced him into confessing.").

[36] *Id.* at *7.

## III. CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that Defendant's Motion to Suppress Evidence/Statements (Docket No. 21) is DENIED. It is further

ORDERED that the time from the filing of the Motion to Suppress—October 18, 2011—through the date of this Order is excluded from the computation of the Speedy Trial Act time pursuant to 18 U.S.C. § 3161(h)(1)(D) and (H).

The parties are directed to appear before Judge Stewart on March 23, 2012, at 2:30 pm, to determine the continued status of this case.

DATED   February 14, 2012.

BY THE COURT:

_____
TED STEWART
United States District Judge